UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THE CENAPS CORPORATION,
    Plaintiff,

v.    Case No. 8:18-cv-1276-T-24 TGW

COMMUNITY OF CHRIST and HERALD
HOUSE d/b/a/ Independence Press,
    Defendants.
_____

HERALD PUBLISHING HOUSE d/b/a
Independence Press,
    Counterclaim-Plaintiff,

v.

THE CENAPS CORPORATION and
TERENCE GORSKI,
    Counterclaim-Defendants.
_____/

**ORDER**

This cause comes before the Court on two motions: (1) Counterclaim-Defendants' Motion to Dismiss Counterclaim (Doc. No.24), which Counterclaim-Plaintiff opposes (Doc. No. 34); and (2) Defendants' Motion for Judgment on the Pleadings (Doc. No. 38), which Plaintiff opposes (Doc. No. 46). As explained blow, both motions are granted in part and denied in part.

**I. Background**[1]

The CENAPS Corporation ("CENAPS") alleges the following in its amended complaint (Doc. No. 14): CENAPS is the owner of all rights to the books and other works of authorship by

---

[1] In response to the motion to dismiss, Herald House filed a copy of several of the publishing agreements, as well as the purported termination letter. The parties agree that the Court can consider these documents without converting the motion to dismiss into a motion for summary judgment, because these documents are central to Herald House's counterclaim and their authenticity is not challenged. (Doc. No. 24, p. 6; Doc. No. 34, p. 7 n.2).

Terence Gorski, who is an internationally recognized expert on substance abuse, mental health, violence, and crime. CENAPS has identified 87 materials that Gorski has written that CENAPS owns. (Doc. No. 14-1). Community of Christ is a not-for-profit corporation that does business as Herald House,[2] also known as Independence Press (collectively referred to as "Defendants").

Prior to September 30, 2017, CENAPS and/or Gorski entered into publishing agreements with Defendants under which Defendants were granted rights to copy and distribute certain materials (hereinafter, "Works"). In August of 2017, CENAPS sent a letter to Defendants purporting to terminate all publishing agreements for the Works, effective September 30, 2017, but it would allow Defendants to sell off their remaining inventory of the Works until December 31, 2017.[3] (Doc. No. 34-1). Despite CENAPS' purported termination of the publishing agreements, Defendants continued to copy and distribute the Works after December 31, 2017. As a result, CENAPS filed suit, in which it alleged copyright infringement (via Defendants' continued copying and distribution of the Works) and trademark infringement (via Defendants' use of the "CENAPS" service mark on their website to advertise and sell the Works to the public).

In response to the amended complaint, Herald House (as Counterclaim-Plaintiff) filed a copyright infringement counterclaim against CENAPS and Gorski (Doc. No. 17), in which it

---

[2]Counterclaim-Plaintiff Herald Publishing House states that it is wrongly named as simply "Herald House" in the amended complaint. However, for consistency, it refers to itself in the relevant documents as "Herald House," and the Court will do so also.

[3]The parties allege in their pleadings that the letter was dated August 3, 2017, but the letter has since been filed and is dated August 8, 2017. (Doc. No. 34-1).

2

alleges the following: The publishing agreements discussed in the amended complaint gave Herald House the exclusive right to publish the Works. The publishing agreements are all essentially identical,[4] and they state the following regarding termination of the agreements: "This Agreement shall continue in force and effect unless terminated by Copyright Owner [Gorski] pursuant to ¶ 7 above [regarding declined request for subsequent printings] or in conjunction with the following" three types of events: (1) book out of print; (2) sales no longer profitable; or (3) Herald House's bankruptcy or liquidation. (Doc. No. 34-1, p. 15).

Herald House contends that the publishing agreements could only be terminated if one of the above four types of events occurred—(1) book out of print; (2) sales no longer profitable; (3) Herald House's bankruptcy or liquidation; or (4) declined request for subsequent printings—and since none of these events occurred, the agreements could not be terminated by CENAPS' August 2017 letter. As such, Herald House contends that the publishing agreements remain in force, and Herald House still has the exclusive license to publish and distribute the Works covered by those agreements. Furthermore, Herald House contends that since Counterclaim-Defendants CENAPS and Gorski are currently publishing and distributing nine of the Works listed in an exhibit to the counterclaim[5] (hereinafter, "Counterclaim Works"), they are violating Herald House's exclusive license to publish and distribute those Counterclaim Works.

## II. Motion to Dismiss

In response to Herald House's counterclaim for copyright infringement, Gorski and

---

[4]The parties agree that the publishing agreements are "essentially identical." (Doc. No. 34, p. 7–8; Doc. No. 34-1).

[5]The exhibit is filed at Doc. No. 25.

CENAPS filed the instant motion to dismiss. As explained below, the motion is granted in part and denied in part.

**A. Standard of Review**

In deciding a motion to dismiss, the district court is required to view the complaint in the light most favorable to the plaintiff. See Murphy v. Federal Deposit Ins. Corp., 208 F.3d 959, 962 (11th Cir. 2000)(citing Kirby v. Siegelman, 195 F.3d 1285, 1289 (11th Cir. 1999)). The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. Instead, Rule 8(a)(2) requires a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)(citation omitted). As such, a plaintiff is required to allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. (citation omitted). While the Court must assume that all of the allegations in the complaint are true, dismissal is appropriate if the allegations do not "raise [the plaintiff's] right to relief above the speculative level." Id. (citation omitted). The standard on a 12(b)(6) motion is not whether the plaintiff will ultimately prevail in his or her theories, but whether the allegations are sufficient to allow the plaintiff to conduct discovery in an attempt to prove the allegations. See Jackam v. Hospital Corp. of Am. Mideast, Ltd., 800 F.2d 1577, 1579 (11th Cir. 1986).

**B. Analysis**

In their motion to dismiss, Gorski and CENAPS argue that since they terminated the publishing agreements via the August 2017 letter, Herald House no longer holds an exclusive license to the Counterclaim Works. As such, they argue that Herald House's copyright

4

counterclaim fails.

Pursuant to 17 U.S.C. § 203(a)(3), a copyright owner can terminate an exclusive license of copyrighted material "at any time during a period of five years beginning at the end of thirty-five years from the date of the grant" of the license. However, "section 203 does not create a minimum term for licenses of indefinite duration." Korman v. HBC Florida, Inc., 182 F.3d 1291, 1294 (11th Cir. 1999). This is because section 203 does not preempt state law. See id. at 1295. Thus, "if state law provides that [contracts for] licenses of indefinite duration may be terminated in less than 35 years, it is state law and not section 203 that governs the question of termination before 35 years." Id. at 1297.

The parties agree that Missouri state law governs the publishing agreements.[6] Gorski and CENAPS argue that since the publishing agreements are for an indefinite period, they are terminable at-will under Missouri law. As such, they contend that the publishing agreements were terminated by the August 2017 letter.

CENAPS and Gorski are correct that under Missouri law, "contracts for an indefinite period of time may be terminated at the will of either party." Superior Concrete Accessories v. Kemper, 284 S.W.2d 482, 490 (Mo. 1955). However, Herald House argues that the publishing agreements are not for an indefinite period of time, because they can be terminated by the happening of one of four specific events described in the agreements—(1) book out of print; (2) sales no longer profitable; (3) Herald House's bankruptcy or liquidation; or (4) declined request for subsequent printings. Therefore, Herald House argues that the publishing agreements are not

---

[6]The publishing agreements provide that they shall be construed, enforced, and governed by Missouri law.

indefinite and not terminable at-will.

Accordingly, the issue presented by the motion to dismiss is whether the publishing agreements are for an indefinite period of time, and thus, terminable at-will. As explained below, the Court finds that they are for an indefinite period of time and terminable at-will.

In Paisley v. Lucas, 143 S.W.2d 262, 269–71 (Mo. 1940),[7] one of the issues before the court was the duration of the employment contract at issue. The relevant contract language stated the following: "'It is understood that said contract and supplements thereto will be continued in full force and effect and will not be cancelled or modified, except by mutual agreement, *** or unless the Insurance Department of the State of Missouri by proper order requires and demands such modification, or cancellation.'" Id. at 269.

The court analyzed the language and first considered whether it showed an intent that the contract would last into perpetuity. The court concluded that it did not, stating:

> "The courts are prone to hold against the theory that a contract confers a perpetuity of right or imposes a perpetuity of obligation. Yet it seems to be the law in this state that, where the intention to do this is unequivocally expressed, the contract will be upheld. . . . But in this jurisdiction . . . courts will only construe a contract to impose an obligation in perpetuity when the language of the agreement compels that construction."

Id. at 270–71 (quoting James Maccalum Printing Co. v. Graphite Compendius Co., 130 S.W. 836, 838 (Mo. Appt Ct. 1910)).

Next, the court considered whether the contract at issue was for an indefinite period of time. The court concluded that it was, stating:

---

[7]Paisley was overruled in part on other grounds by Novak v. Baumann, 329 S.W.2d 732, 733 (Mo. 1959).

> The period of employment under the contract . . . is not definitely ascertainable by any fixed criterion. The duration of the contract was not fixed expressly or by implication. Its expiration does not depend upon the expiration of a period of time, upon the completion of a given undertaking, or upon the happening of some event. A contract for life will be upheld only where the intention, that the contract's duration is for life, is clearly expressed in unequivocal terms. We hold that appellant's employment under the contract was for an indefinite period and could be terminated at the will of either party.

Id. at 271.

Herald House, however, argues that the publishing agreements in the instant case are not indefinite and cannot be deemed terminable at-will, because they contain clear language outlining exactly when they will be terminated (*i.e.,* only when one of the four specified events occurs). Missouri case law does not support Herald House's argument.

In Haith v. Model Cities Health Corporation of Kansas City, 704 S.W.2d 684, 685–86 (Mo. App. Ct. 1986), one of the issues before the court was whether an employment contract between a hospital and certain doctors was terminable at-will. The contract provided that it could be terminated: (1) at any time by mutual consent of the parties; (2) due to the death of one of the doctors; (3) due to a doctor's failure to maintain licensure; (4) due to a doctor's disruptive behavior; (5) due to a doctor failing to meet their professional responsibilities; or (6) due to a doctor becoming permanently disabled. See id. at 686. The plaintiff-doctors argued that the contract was not terminable at-will, because the parties had contractually limited the reasons for termination. See id. The court rejected their argument, because the contract was for an indefinite period, and thus, it was terminable at-will. See id.

Likewise, in Main v. Skaggs Community Hospital, 812 S.W.2d 185, 186 (Mo. App. Ct. 1991), one of the issues before the court was whether the employment contract between the

plaintiff-nurse and hospital was terminable at-will. The contract stated the following regarding its duration: "'The Hospital agrees to appoint the Nurse Anesthetist for an indefinite period and the Nurse Anesthetist agrees to serve in such capacity for such period subject to the terms and provisions of this agreement, providing, however, that either party may terminate this agreement, with just cause, by giving sixty days' written notice by registered mail.'" Id.

The plaintiff argued that because the contract limited the reasons for which the hospital could discharge him, the contract was not terminable at-will. See id. at 189. The court rejected the plaintiff's argument, stating:

> The contract is not limited to a fixed period of time, nor does it terminate upon completion of one or more specific undertakings or upon the occurrence of some event. It is, by its own terms, "for an indefinite period." It purports to grant plaintiff the right to perpetual employment by Hospital unless plaintiff's performance becomes deficient enough to constitute "just cause" for firing him. It is therefore a contract imposing an obligation in perpetuity, . . . [which is condemned by Paisley].

Id. The court concluded that since the contract was for an indefinite period, it was terminable at-will. See id.

Conversely, Armstrong Business Services, Inc. v. H & R Block, 96 S.W.3d 867 (Mo. App. Ct. 2002), is an example of a contract with a fixed and definite term. The franchise agreements in Armstrong stated the following regarding their term: "The term of this Agreement shall run for a period of five years from the date hereof, with further provisions that it shall be automatically renewed for successive periods of five years each, unless mutually terminated or terminated [for cause due to a material breach] pursuant to paragraph 12." Id. at 870.

One of the issues before the court was whether the agreements were for an indefinite

8

duration. See id. at 873. The court found that the agreements were not for an indefinite duration, stating:

> The practical effect of the duration provision in the franchise agreements is the creation of a perpetual contract. As written, a franchise agreement is to continue for an initial period of five years from the date of the agreement and then automatically renew for a series of five-year contracts until the parties agree not to renew the agreement and, therefore, to terminate the business relationship. The parties, however, failed to create an *enforceable* perpetual contract. The duration provision does not unequivocally express an intent of the parties to create a perpetual, never-ending franchise agreement. Instead, the clause providing for automatic renewal contradicts an intention that the contract would last forever.
>
> \* \* \*
>
> The franchise agreements are not indefinite contracts. Instead, they have definite, fixed terms. The parties explicitly provided for five-year terms. A franchise agreement has an initial period beginning on the date of its formation and expiring five years later. Thereafter, if renewed, the agreement will run for another term of five years. The franchise agreements' renewal provision will not, however, be enforced without assurance of mutual assent. . . . Thus, should the parties desire, they may choose to continue their relationship under a renewed contract for an additional five-year period. In such a case, the parties would be bound to the completion of that five-year term except for instances of material breach or a mutual agreement to terminate sooner.

Id. at 877–78 (internal citation omitted).

In the instant case, Herald House argues that the publishing agreements remain in force unless and until one of the four specified events occurs. Thus, it appears that Herald House may be arguing that a perpetual agreement exists. However, as explained by one court facing the issue of whether an *enforceable* perpetual agreement existed:

> In order to find an intent that a contract be enforced perpetually, the Missouri Supreme Court has set the bar high: there must be an *unequivocal* expression that the contract last forever. The parties agreed at oral argument, and our own investigation is in accord, that

> the only Missouri case where this high hurdle has been met analyzed
> a contract with the word "perpetually" in the agreement.

H & R Block Tax Services LLC v. Franklin, 691 F.3d 941, 945 (8th Cir. 2012)(citation omitted).

In the instant case, the publishing agreements do not explicitly state that they are intended to last forever. As such, based on the above case law, the publishing agreements are not *enforceable* perpetual agreements.

Herald House also argues that the publishing agreements are not for an indefinite period of time, because the publishing agreements state that they will terminate upon the happening of one of four specified events. However, the cases discussed above also contained identifiable termination events that did not prevent them from being deemed to last for an indefinite period of time. See Paisley, 143 S.W.2d at 269 (the contract stated that it would continue in full force and effect unless the Insurance Department of the State of Missouri required cancellation); Haith, 704 S.W.2d at 686 (the contract provided that it could be terminated due to death, disability, failure to maintain licensure or meet professional responsibilities, or disruptive behavior); Main, 812 S.W.2d at 186 (the contract stated that the nurse would be appointed for an indefinite period unless either party terminated the agreement for just cause). To support its argument, Herald House points to cases based on Georgia and Oregon law; Herald House fails to cite to similar cases based on Missouri law.

Accordingly, based on Missouri case law, the publishing agreements do not contain a fixed and definite term. Instead, the publishing agreements are for an indefinite period, making them terminable at-will.

Given the conclusion that the publishing agreements were terminable at-will, and given

that Herald House alleges that CENAPS "purport[ed] to have terminated" the publishing agreements by its August 2017 letter, Herald House cannot show that it continues to have an exclusive license to publish the Works identified in the termination letter. To the extent that Herald House's counterclaim is based on Works identified in the termination letter, Herald House's counterclaim fails.

However, it is unclear whether all of the Counterclaim Works were identified as being terminated by the August 2017 termination letter, as the termination letter does not provide the full title of each of the terminated Works. Furthermore, as pointed out by Herald House, the termination letter states that some of the Works are not being terminated because they are co-authored by Gorski and another author. It appears that at least one of the Counterclaim Works is co-authored by Gorski and another author,[8] so the publishing agreement relating to that Counterclaim Work may not have been terminated by the termination letter. Thus, to the extent that Herald House's counterclaim is based on Works that are not identified in the termination letter, the Court denies CENAPS and Gorski's motion to dismiss.

The Court does not have sufficient information to determine which of the publishing agreements relating to the Counterclaim Works was terminated by the August 2017 letter. As such, CENAPS and Gorski are directed to file a short notice by March 8, 2019 listing the Counterclaim Works that were identified in the termination letter and explaining how the Court can match the Counterclaim Works to the Works identified in the termination letter. By March 15, 2019, Herald House is directed to file a notice of agreement with CENAPS and Gorski's

---

[8]One of the Counterclaim Works is titled, "Denial Management Counseling Workbook: Practical Exercises for Motivating Substance Abusers to Recover," and it is identified as being "by Terence R. Gorski, with Stephen F. Grinstead." (Doc. No. 25).

notice or file a notice explaining why/how it disagrees with their notice.

### III. Motion for Judgment on the Pleadings

Next, Herald House and Community of Christ (collectively referred to in this section as "Herald House") move for judgment on the pleadings as to the copyright infringement and trademark infringement claims asserted against them by CENAPS in the amended complaint. As explained below, the motion is granted in part and denied in part.

#### A. Standard of Review

The standard of review for a motion for judgment on the pleadings is the same as for a motion to dismiss—the question is whether the count states a claim for relief. See Sun Life Assurance Co. of Canada v. Imperial Premium Finance, LLC, 904 F.3d 1197, 1207 (11th Cir. 2018). The court accepts the facts in the complaint as true and views them in the light most favorable to the non-moving party. See Ortega v. Christian, 85 F.3d 1521, 1524 (11th Cir. 1996).

#### B. Analysis

Herald House contends that it is entitled to judgment on CENAPS' copyright infringement and trademark infringement claims. In support of this contention, Herald House asserts four arguments: (1) Herald House cannot infringe CENAPS' copyrights because the publishing agreements were not terminated by the August 2017 letter; (2) even if the termination letter could terminate the publishing agreements, it would only terminate those specific Works identified in the letter; (3) even if the termination letter could terminate the publishing agreements, the first sale doctrine would allow Herald House to sell the copies of the Works that Herald House published prior to the September 30, 2017 termination date; and (4) if CENAPS' copyright claim fails, then its trademark infringement claim fails as well. Accordingly, the Court

will address each argument.

### 1.  Termination

Herald House first argues that it cannot infringe CENAPS' copyrights because the publishing agreements were not terminated by the August 2017 letter.  However, the Court has fully analyzed this argument above in Section II and found that the publishing agreements are for an indefinite period, making them terminable at-will.  Thus, CENAPS has stated a claim for copyright infringement.

### 2.  Works Identified in the Termination Letter

Next, Herald House argues that even if the termination letter could terminate the publishing agreements, it would only terminate those specific Works identified in the letter, despite the fact that CENAPS alleges in its amended complaint that the termination letter terminated Herald House's exclusive license to all of the Works.  Herald House is correct that the termination letter (Doc. No. 34-1) conflicts with CENAPS' allegation (Doc. No. 14. ¶ 18) that the termination letter terminated Herald House's exclusive license to publish all of the Works.  The termination letter only identifies 50 Works to which the letter purportedly applies.

CENAPS does not address this argument in its response.  Accordingly, the Court agrees with Herald House that the termination letter only terminated those specific Works identified in the letter.  As such, the Court grants Herald House's motion and dismisses CENAPS' copyright claim to the extent that it relates to Works not listed in the termination letter.

The termination letter does not clearly identify the title of each of the Works.  In order to provide the Court with necessary information, CENAPS is directed to file a short notice by March 8, 2019 that identifies which of the 87 materials listed in Document Number 14-1 are the

50 Works that were purportedly terminated by the August 2017 letter and the explain how the Court can match the Works identified in the termination letter with the ones listed in Document Number 14-1. By March 15, 2019, Herald House is directed to file a notice of agreement with CENAPS notice or file a notice explaining why/how it disagrees with CENAPS' notice.

### 3. First Sale Doctrine

Next, Herald House argues that even if the termination letter could terminate the publishing agreements, the first sale doctrine would allow Herald House to sell the copies of the Works that Herald House had published prior to the September 30, 2017 termination date. As explained below, the Court finds that the first sale doctrine is inapplicable.

Pursuant to 17 U.S.C. § 106(3), the owner of a copyright has the exclusive right to authorize the distribution of copies of the copyrighted work to the public. Furthermore, § 109(a) provides: "Notwithstanding the provisions of section 106(3), the owner of a particular copy . . . lawfully made under this title . . is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy . . . ." Section 109(a) is known as the first sale doctrine. "The whole point of the first sale doctrine is that once the copyright owner places a copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution." Quality King Distributors, Inc. v. L'anza Research Intern., Inc., 523 U.S. 135, 152 (1998). Thus, the first sale doctrine gives the copyright owner the right to control the first sale of the copyrighted material, and it protects a buyer who then re-sells the copyrighted material.

In the instant case, Herald House's inventory that was published prior to September 30, 2017 had not yet been sold, and as such, Herald House's sale of such inventory is not protected

by the first sale doctrine. The Court makes no finding regarding whether Herald House committed copyright infringement by selling off such existing inventory.[9] Instead, the Court is merely finding that the first sale doctrine does not protect such conduct.

### 4. Trademark Infringement

Next, Herald House argues that if CENAPS' copyright claim fails, then its trademark infringement claim fails as well. However, as explained above, the Court has found that CENAPS may still pursue its copyright infringement claim. As such, the Court denies Herald House's motion to dismiss CENAPS' trademark infringement claim.

## IV. Conclusion

Accordingly, it is ORDERED AND ADJUDGED that:

(1) Counterclaim-Defendants' Motion to Dismiss Counterclaim (Doc. No.24) is **GRANTED IN PART AND DENIED IN PART**: The motion is **GRANTED** to the extent that Herald House's counterclaim is based on Works identified in the termination letter that were solely authored by Gorski; otherwise, the motion is **DENIED**.

(2) CENAPS and Gorski are directed to file a short notice by March 8, 2019 listing the Counterclaim Works that were identified in the termination letter and explaining how the Court can match the Counterclaim Works to the Works identified in the termination letter.

(3) By March 15, 2019, Herald House is directed to file a notice of agreement with

---

[9]Herald House is free to later present the Court with case law showing that its sale of its existing inventory did not constitute copyright infringement.

CENAPS and Gorski's notice or file a notice explaining why/how it disagrees with their notice.

(4) Defendants' Motion for Judgment on the Pleadings (Doc. No. 38) is **GRANTED IN PART AND DENIED IN PART**: The motion is **GRANTED** to the extent that CENAPS' copyright claim is based on Works that are not listed in the termination letter; otherwise, the motion is **DENIED**.

(5) CENAPS is directed to file a short notice by March 8, 2019 that identifies which of the 87 materials listed in Document Number 14-1 are the 50 Works that were purportedly terminated by the August 2017 letter and explaining how the Court can match the Works identified in the termination letter with the ones listed in Document Number 14-1.

(6) By March 15, 2019, Herald House is directed to file a notice of agreement with CENAPS notice or file a notice explaining why/how it disagrees with CENAPS' notice.

**DONE AND ORDERED** at Tampa, Florida, this 27th day of February, 2019.

*Susan C. Bucklew*
SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record

16